**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| CURT LOWDER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Case No. 1:18-cv-01216-TWP-MPB |
| | ) |
| PAUL TALBOT, Dr., and LAFLOWER, Ms. | ) |
| | ) |
| Defendants. | ) |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed by Defendants

Paul Talbot, M.D. ("Talbot") and Michelle LaFlower, HSA ("LaFlower"), pursuant to Federal

Rule of Civil Procedure 56 (Dkt. 33). Plaintiff Curt Lowder ("Lowder") brings this civil rights

action under 42 U.S.C. § 1983. Lowder was at times relevant to this case an inmate at Pendleton

Correctional Facility ("Pendleton"). Defendant Talbot is a physician at Pendleton, and Defendant

Michelle[1] LaFlower is the Health Services Administrator at Pendleton. Lowder alleges the

Defendants were deliberately indifferent to his serious hip condition, his serious back condition,

and a serious gastrointestinal condition. (Dkt. 1.) He filed a Response, Dkts. 41–42[2], and the

Defendants filed a Reply, Dkt. 43. For the reasons stated below, the Defendants' Motion for

Summary Judgment is **granted**.

---

[1]Lowder's Complaint identified LaFlower only as "Ms. LaFlower, Health Service Administrator." (Dkt. 1.) Michelle LaFlower has appeared in this action and defended against the case. (*See, e.g.*, Dkts. 12, 13, 33.) Lowder appears to agree that Michelle LaFlower is the person he intended to sue.

[2]Portions of Lowder's response suggest that he is requesting summary judgment in his favor. (*See, e.g.*, Dkt. 42 at 30.) To the extent he makes such a request, the request is inappropriate because motions "must not be contained within a brief, response, or reply to a previously filed motion, unless ordered by the court." S.D. Ind. L.R. 7-1(a). Regardless, as explained in this Order, the Defendants are entitled to summary judgment as to Lowder's claims against them.

# I. <u>SUMMARY JUDGMENT STANDARD</u>

A motion for summary judgment asks the court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasiliades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009), *abrogation on other grounds recognized by Jones v. Carter*, 915 F.3d 1147, 1149–50 (7th Cir. 2019).

To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). An affidavit used as support must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). Statements that "fall outside the affiant's personal knowledge or statements that are the result of speculation or conjecture or [are] merely conclusory do not meet this requirement." *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999). Likewise, unsworn statements do not meet the requirements of Rule 56. *See Collins v. Seeman*, 462 F.3d 757, 760 n.1 (7th Cir. 2006).

The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *See Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir.

2014).  The court need only consider the cited materials, but it may consider other materials in the record.  Fed. R. Civ. P. 56(c)(3).  The Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them.  *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572–73 (7th Cir. 2017).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Not every factual dispute between the parties will prevent summary judgment, and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Finally, although *pro se* filings are construed liberally, *pro se* litigants such as Lowder are not exempt from procedural rules.  *See Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008) (noting that "*pro se* litigants are not excused from compliance with procedural rules"); *Members v. Paige*, 140 F.3d 699, 702 (7th Cir. 1998) (stating that procedural rules "apply to uncounseled litigants and must be enforced").

## II.  BACKGROUND

The Defendants provide a statement of undisputed material facts.  (Dkt. 34 at 2–12.)  In his response brief, Lowder identifies some facts that he contends are disputed.  (*See generally* Dkt. 42.)  The Court accepts those facts as true to the extent they are supported by admissible evidence in keeping with its duty to construe the record in the light most favorable to Lowder.

### A.  Medical Treatment at Wabash Valley Correctional Facility

Before his incarceration at Pendleton, Lowder was incarcerated at Wabash Valley Correctional Facility ("WVCF"). (Dkt. 35-3 at 8.[3]) While he was at WVCF, orthopedic specialist Dr. Kurt Madsen ("Dr. Madsen") treated him for low back and hip pain. (Dkt. 35-2 ¶4; Dkt. 35-3 at 29.) He also had physical therapy for those conditions. (Dkt. 35-3 at 26.)

The record includes a "Provider Consultation Report" with an illegible signature that is dated December 14, 2016. (Dkt. 42-1 at 29.) It includes diagnoses of right hip degenerative joint disease and lumbar spine L5 spondylosis[4] and states that the author will make a recommendation based on lumbar x-rays that were ordered. *Id.* A treatment note (from an unknown medical provider) dated December 15, 2016, suggests that the "Provider Consultation Report" was authored by Dr. Madsen. *See id.* at 30.

In addition, the record includes a document titled "Consultation" that was completed by Barbara J. Riggs, RN, on June 8, 2017, under the supervision of Dr. Samuel Byrd ("Dr. Byrd") (a physician at WVCF). *Id.* at 19; Dkt. 35-3 at 55 (identifying Dr. Byrd as a physician at WVCF). It states:

> 40 [year old] patient last seen by Dr. Madsen on 12/14/1[6][5] for [complaints of] right hip [degenerative joint disease] on x-ray. Patient [complained of] pain with internal rotation. Patient completed [physical therapy] as ordered by Dr. Madsen with no improvement of symptoms. X-ray of lumbar spine showed L5 spondylosis. Dr. Byrd sent a note to CHOPS asking if Dr. Madsen had made any recommendations following the x-rays. Per Dr. Madsen, this patient will [n]eed a [right] hip replacement. We can go right to scheduling or we can bring him back for [follow-up] to discuss the surgery and answer any questions. Given patient[']s

---

[3]Citations to Lowder's deposition transcript are to the original page numbers, not the page numbers electronically "stamped" on the document when it was filed in CM/ECF.

[4]Spondylosis is age-related change of the bones (vertebrae) and disc of the spine; these changes are often called degenerative disc disease and osteoarthritis. https://www.uofmhealth.org/health-library/abr8401 (last visited Feb. 12, 2020).

[5]The original record actually says "12/14/17," *see* Dkt. 42-1 at 19, but this appears to be a typographical error, given that the record was authored on June 8, 2017, and that Lowder transferred to Pendleton in September 2017, after which he did not see Dr. Madsen again.

age, Dr. Byrd is requesting that he be seen by Dr. Madsen again. Requesting to schedule.

Dkt. 42-1 at 19. At his deposition, Lowder initially testified that he saw Dr. Madsen for the last time in September 2017, but, later, he admitted that he was confused and that the last appointment with Dr. Madsen must have been in August 2017. Dkt. 35-3 at 29–30, 82. Thus, the Court uses the August date. During that appointment, Dr. Madsen told Lowder that he was going to prolong any hip replacement surgery until it was absolutely necessary. *Id.* at 31–32. He said that he wanted to put off hip surgery because Lowder was too young for it, given that a hip replacement is only good for 20 years and Lowder was only about 40 years old at the time. *Id.* at 23, 30, 34. At his deposition, Lowder admitted that he was not aware of any record showing that Dr. Madsen ever entered an order for him to have hip surgery. *Id.* at 37–38.

The record also includes a treatment note from Dr. Byrd that is dated September 2, 2017, and states that Dr. Madsen diagnosed Lowder with "spondylolisthesis with L5 Pars Defect."[6] Dkt. 42-1 at 31. On that date, Dr. Byrd also observed that Lowder had a popping noise in his lumbar spine directly over the L2-L3 region and noted that Dr. Madsen recommended more physical therapy for the hip/lumbar regions. *Id.*[7] Byrd's plan was physical therapy and an adjusted dose

---

[6]A pars defect (or spondylolysis) is a stress fracture through the pars interarticularis of lumbar vertebrae. *See* https://www.hopkinsmedicine.org/health/conditions-and-diseases/spondylolysis (last visited Feb. 12, 2020). Spondylolisthesis is a spinal condition that occurs when one of the vertebrae slips forward. (*See* Dkt. 35-2 ¶ 5, defining isthmic spondylolisthesis); *see also* https://www.hopkinsmedicine.org/health/conditions-and-diseases/overuse-injuries (stating that spondylolisthesis "is caused by excessive flexion and extension of the low back" and that "X-rays show that a part of 1 vertebra in the low back slips forward on the vertebrae below it") (last visited Feb. 12, 2020).

[7]In his response, Lowder disputes Dr. Talbot's affidavit statement that Madsen diagnosed him with probable isthmic spondylolisthesis, stating,

> Plaintiff however was diagnosed by orthopedic specialist, Dr. Kurt Madsen, with [degenerative joint disease] of right hip, deformalty [sic] in femoral, L5 par defects, spondylolisthesis, a height decrease in the L4-L5 region of lumbar spine, and a popping sound in the L2-L3 region of lumbar spine, which was being reviewed by specialist Madsen, and was suppost [sic] to consult on his findings at Plaintiff's next [follow-up] visit, but Plaintiff was transferred to Pendleton Correctional.

5

of Tramadol (also known as Ultram) for hip pain, as well as an adjusted dose of Neurontin (also known as Gabapentin) and a continued home exercise program for low back pain. *Id.* at 32.[8] The treatment note for September 2, 2017 also shows that Lowder had "taper doses" of Pepcid and Prilosec, both of which had "stop dates" of September 23, 2017. *Id.*

## B.     Medical Treatment at Pendleton

Lowder was transferred to Pendleton on approximately September 26 or 27, 2017. *See* Dkt. 42-1 at 5 (Request for Health Care form dated September 26, 2017, noting that Lowder had just come from WVCF); Dkt. 35-3 at 30 (Lowder's testimony that he arrived at Pendleton on September 27, 2017).[9] At the time of his transfer, he had active prescriptions for Gabapentin and Ultram (also known as Tramadol) for his hip and back pain; he also had an active prescription for Pepcid for gastroesophageal reflux disease ("GERD"). (Dkt. 35-2 ¶ 6.)

Dr. Talbot is a physician licensed to practice medicine in the State of Indiana. (Dkt. 35-2 ¶ 1.) He is currently employed as a physician by Wexford of Indiana at Pendleton. *Id.* ¶ 2. During

---

(Dkt. 42 at 8.) Lowder cites Exhibit A-11 to support this claim, but that exhibit does not mention a femoral deformity, a height decrease in the L4-L5 region of the lumbar spine, or the need to consult with Lowder at a follow-up visit. *See* Dkt. 42-1 at 29–32. The Court is not obliged to scour the record to find support for these claims, *see Grant*, 870 F.3d at 572–73, and does not credit them for purposes of summary judgment.

[8]The medical records discussed in the preceding three paragraphs were placed into the record by Lowder, not the defendants. They bare Bates numbers, *see e.g.*, Dkt. 42-1 at 19, and, thus, appear to have been produced to Lowder by the Defendants. The Defendants did not object to the authenticity or admissibility of these records in their reply, *see* Dkt. 43, and, thus, the Court summarizes them here in keeping with its duty to construe the facts in the light most favorable to Lowder.

[9]Although his unsworn statement is not in admissible form, *see Collins*, 462 F.3d at 760 n.1, Lowder also states in his response brief that he arrived at Pendleton on September 26, 2017, *see* Dkt. 42 at 4, confirming that the transfer likely occurred on that date. The precise date is not, however, material.

his time at Pendleton, he saw and treated Lowder. *Id.* ¶ 3. After Lowder's transfer, Lowder continued to receive Gabapentin, Ultram, and Pepcid. *Id.* ¶ 6.[10]

On September 26, 2017, Lowder completed a "Request for Health Care" form ("RHCF"). (Dkt. 42-1 at 5.) He said that he had hip and back disorders and that he had a bottom bunk and bottom range pass that he would like renewed at Pendleton. *Id.* On October 4, 2017, an unidentified member of the health care staff (the signature is illegible) wrote "renewed" in the response section of the form. *Id.*

In early October 2017, Lowder completed another RHCF. (Dkt. 42-1 at 6.) He wrote that Pepcid was not working for his heartburn, noting that he took Prilosec for the previous two years and had no problems. *Id.* An unidentified staff member (the signature is illegible) appears to have seen Lowder in nursing sick call, *see id.* ("NSC" notation in response box), and responded to the form, writing, "You can buy Prilosec off commissary. Try this then if no relief put in new [health care form]," *id.*

---

[10]In his summary judgment affidavit, Talbot stated that he "extended" those prescriptions, which the Court understands to mean that Talbot allowed Lowder to continue receiving them at Pendleton. (Dkt. 35-2 ¶ 6.) In his response, Lowder contests that Talbot extended the prescriptions, saying,

> this is not the true facts, Plaintiff's prescribed medication Tramadol and Neurontin was sent with Plaintiff in the medical records that was sent with the transfer . . . . Plaintiff['s] order of Tramadol ran out on October 23, 2017, and the neurontin order ran out on November 30, 2017, these doses of medications arrived with Lowder at Pendleton.

(Dkt. 42 at 9.) In support, he cites Exhibit A-12, which is a page from a treatment note from Byrd that is dated September 2, 2017, and shows a prescription for Neurontin that stops on November 30, 2017, and a prescription for Tramadol that stops on October 23, 2017. (Dkt. 42-1 at 32.) To the extent Lowder is attempting to dispute that Dr. Talbot was responsible for him continuing to receive Tramadol and Neurontin once he transferred to Pendleton and instead show that his prescriptions somehow "automatically" transferred with him, the attempt is unsuccessful. Dr. Byrd's treatment note shows that Lowder had prescriptions for Neurontin and Tramadol that expired on November 30 and October 23, 2017, respectively, but it does not show that those prescriptions would automatically continue once Lowder transferred to Pendleton. Lowder's unsworn contention that they did is, at best, inadmissible speculation. *See Collins*, 463 F.3d at 760 n.1; *Stagman*, 176 F.3d at 995. Regardless, the potential dispute is immaterial because the only relevant point is that Lowder continued receiving the medications for a time after the transfer.

Lowder's prescription for Tramadol had a "stop" date of October 23, 2017. (*See* Dkt. 42-1 at 32.) On October 23, 2017, Lowder completed another RHCF. *Id.* at 9. He asked why his Tramadol was discontinued, noting that he had hip and back disorders and that Dr. Byrd had just reordered his pain medications 45 days ago. *Id.* Health care staff scheduled him for an appointment with a doctor. *Id.* On October 26, 2017, Lowder completed another RHCF. *Id.* at 7. He asked for a refill of his prescription for Tramadol, noting that he was in excruciating pain and asking why Dr. Byrd's and Dr. Madsen's orders were being disregarded. *Id.* Health care staff again noted that he was scheduled to see the doctor. *Id.*

Dr. Talbot first saw Lowder on October 31, 2017. (Dkt. 35-2 ¶ 8; Dkt. 35-4 at 45.) His treatment notes show that Lowder's GERD was improving and that his symptoms were relieved with medication. (Dkt. 35-4 at 45.) According to Lowder, the visit was brief. (Dkt. 35-3 at 41.) He asked Dr. Talbot why his pain medications had been discontinued, and Dr. Talbot said he would have to review Lowder's medical packet. *Id.*

After Dr. Talbot saw Lowder on October 31, 2017, he researched Lowder's condition and reviewed Lowder's chart and his outside referrals with Dr. Madsen. (Dkt. 35-2 ¶ 7.) Dr. Talbot's review of Dr. Madsen's records revealed no specific recommendation that Lowder receive any back or hip surgery. *Id.* ¶ 8. Dr. Talbot understood Dr. Madsen's diagnosis of spondylolisthesis with a pars defect to be a diagnosis of isthmic spondylolisthesis. *Id.* ¶ 4; *see also* Dkt. 35-4 at 45 (Dr. Talbot's treatment note from Lowder's October 31, 2017 visit; stating, "normal lumbospinal X-ray's [sic] but a Dr. Madsen diagnosed isthmic (my interpretation of the reported pars defect issue) spondylolisthesis"). Dr. Talbot then researched isthmic spondylolisthesis. (Dkt. 35-2 ¶ 8.) That research indicated that, in adults, non-surgical treatment with non-steroidal anti-inflammatory

medications ("NSAIDs") and exercise is recommended. *Id.*; *see also* Dkt. 35-4 at 45 (Dr. Talbot's treatment note from October 31, 2017, documenting the research sources and findings).

Dr. Talbot also ordered x-rays of Lowder's lumbar spine. (Dkt. 35-4 at 44.) A radiologist from Meridian Radiology read the x-rays. (Dkt. 42-2 at 16.) He reported:

> Low back pain.
>
> AP and lateral lumbar spine
>
> Images demonstrate all five lumbar segments in anatomic alignment. Vertebral bodies []are maintained in height. Intervertebral disc narrowing is demonstrated at the L4-5 interspace. Vertebral canal is patent. Transverse processes, pedicles and spinous processes appear intact. Facet joints are unremarkable. There is no evidence of spondylolysis or spondylolisthesis.
>
> Impression:
>
> 1. No acute bony abnormality.
> 2. L4-5 mild intervertebral disc loss of height

*Id.* (original capitalization altered; punctuation as in original).

Dr. Talbot noted that the most recent x-rays did not find spondylolisthesis and that Lowder had been diagnosed with mild, degenerative joint disease of the hip and back. (Dkt. 35-2 ¶ 9; *see also* Dkt. 35-4 at 46) (Dr. Talbot's treatment note from Lowder's October 31, 2017, appointment, summarizing August 2016 x-ray as showing mild superior acetabular osteophytes[11] in the right and left hips and summarizing August 2017 x-ray as showing mild degenerative joint disease). He found Lowder's complaints of symptoms in his back and hip to be consistent with a patient suffering from arthritis. (Dkt. 35-2 ¶ 9.) As such, Dr. Talbot prescribed Mobic, which is an NSAID. *Id.* Dr. Talbot's research indicated that anti-inflammatories were the most appropriate medications for spinal spondylolisthesis and that anti-inflammatory medications were also

---

[11]Osteophytes are bone spurs. *See* https://www.mayoclinic.org/diseases-conditions/bone-spurs/symptoms-causes/syc-20370212 (last visited Feb. 12, 2020).

appropriate for treatment of discomfort secondary to osteoarthritis. *Id.* As such, he substituted Mobic for Lowder's prior prescription of Ultram. *Id.* At the time, Dr. Talbot's goal was to find an appropriate long-term medication that addressed Lowder's concerns but did not leave him with any potentially habit-forming narcotics or controlled substances. *Id.* ¶ 21.

Because Lowder had a current prescription for Gabapentin, Dr. Talbot also looked at current research about the use of that medication. *Id.* ¶ 10. His research indicated that Gabapentin was not considered effective for chronic low back pain, and the source he consulted noted, "we suggest not treating patients for chronic low back pain with gabapentinoids." *Id.*; (*see also* Dkt. 35-4 at 46) (Dr. Talbot's treatment note from Lowder's October 31, 2017 appointment; recording sources and results of research). Given that Lowder's complaints were primarily low back pain secondary to osteoarthritis, he ordered a taper of Gabapentin, which would be discontinued over several weeks. (Dkt. 35-2 ¶ 10; *see also* Dkt. 35-4 at 42–43.) Dr. Talbot also renewed Lowder's prescription for Pepcid for GERD. (Dkt. 35-2 ¶ 10.)

On November 2, 2017, Lowder completed another HCRF. (Dkt. 42-1 at 10.) He complained that Dr. Talbot had decreased his Neurontin and discontinued his Tramadol even though Dr. Byrd had approved them; he asked why his medications were being canceled and decreased. *Id.* An unidentified health care staff member (the signature is illegible) responded, "You saw Dr. Talbot on 10/31/17. Based upon his exam and a review of your chart, he discussed the plan of 'management of arthropathy is NSAIDS, no renewal of Tramadol is indicated. Wean off Neurontin." *Id.* On November 6, 2017, Lowder completed another HCRF. *Id.* at 11. He asked what medical findings warranted Dr. Talbot stopping and changing his prescribed pain medications and said he had been in excruciating pain in his lower back and hip since the medication change. *Id.* On November 7, 2017, an unidentified health care staff member (the

signature is illegible) responded, "Based on your 10/31/17 chronic care visit, Dr. Talbot charts your physical exam, and review of chart, you were diagnosed with isthmic spondylolisthesis by Dr. Madsen and per 'Essentials of Neuromuscular Care, 3rd Edition' 'in adults nonsurgical treatment with NSAIDs and exercise is recommended.' Dr. Talbot did prescribe an NSAID, Mobic." *Id.*

On November 16, 2017, Lowder completed another HCRF. *Id.* at 12. He said he had been in excruciating pain since Dr. Talbot changed his pain medications and that Mobic was not working. *Id.* An unidentified nurse saw him at nursing sick call on November 22, 2017 and referred to him the doctor. *Id.* On November 27, 2017, Lowder completed another HCRF, this time checking a box indicating that he wanted to communicate with "Health Care Administrator Bergerson." *Id.* at 13. He wrote that he had been in excruciating pain in his back and hip due to the change in his medication. *Id.* He asked what findings Dr. Talbot relied on to change his prescriptions and requested that his situation be reviewed. *Id.* An unidentified health care staff member (the signature is illegible) wrote in the response area that Lowder was seen by Dr. Talbot on November 28, 2017. *Id.*

Dr. Talbot saw Lowder on November 28, 2017. (Dkt. 35-2 ¶ 11; Dkt. 35-4 at 36–38.) During that visit, Lowder said that his current dose of Mobic was not helping his pain. (Dkt. 35-2 ¶ 11; Dkt. 35-4 at 36.) Dr. Talbot had no new findings, and Lowder continued to show the ability to ambulate. *Id.* Based on Lowder's complaints of pain, though, he doubled Lowder's dose of Mobic. *Id.*

On December 13, 2017, Lowder completed another HCRF. *Id.* at 15. He complained that he was still in excruciating pain and that Mobic was not helping, asked to see a specialist, and

asserted that Dr. Talbot had misdiagnosed his condition. *Id.* It appears that, in response, health care staff scheduled him to see the doctor. *See id.* ("MDSC" notation in response area).

Dr. Talbot saw Lowder again on December 19, 2017. (Dkt. 35-2 ¶ 12; Dkt. 35-4 at 33–35.) Lowder requested Tramadol and Neurontin, explaining that Effexor, Pamelor, and Tegretol gave him negative side effects and that Mobic did not work. *Id.* They discussed the location of his hip pain, which Dr. Talbot found to be consistent with arthritis. *Id.* Dr. Talbot was concerned that there might be a systemic inflammatory component to his discomfort that was related to arthritis. *Id.* Dr. Talbot also reviewed the most recent x-rays with Lowder because they showed some degenerative changes, but no spondylolysis and no spondylolisthesis, which findings differed from an earlier x-ray report reviewed by Dr. Madsen. *Id.* Dr. Talbot's assessment at the time was right hip degenerative disc disease. *Id.* Because he was worried about a potential inflammatory component, Dr. Talbot ordered Prednisone (an oral steroid) with the hope of addressing the potential inflammatory component of his pain. *Id.* At the time, Dr. Talbot did not believe there was a need for Tramadol or Neurontin, especially given the chronic nature of Lowder's complaints. *Id.* Dr. Talbot also ordered that Lowder be seen by an on-site physical therapist. *Id.*

On December 20, 2017, Lowder completed another HCRF in which he asked for his Pepcid prescription to be refilled. (Dkt. 42-1 at 16.) Health care staff scheduled him to see Dr. Talbot. *Id.*

On January 2, 2018, Dr. Talbot entered a new order renewing Lowder's prescriptions for Pepcid and Mobic. (Dkt. 35-2 ¶ 13; Dkt. 35-4 at 27–29.) He also noted that his previous order for physical therapy had not yet been executed, so he ordered the nursing staff to check into the progress of the prior referral to physical therapy. *Id.*; *see also* Dkt. 35-4 at 25–26.

On January 25, 2018, physical therapist Dana Miller saw Lowder. (Dkt. 35-4 at 18–19.) Dana Miller's treatment note reads, in relevant part:

> He has also had multiple visits to physical therapy at [Terre Haute Regional Hospital], which was documented to have had no benefit . . . . He was issued a new copy of general hip exercises and was reeducated on them verbally. He was advised to perform them daily to his tolerance, use heat and ice as able and to modify his activities to help him manage his pain. [Physical therapy] did not benefit him in the past, as he has pains and popping in his joints with most movements. He will not have any further PT sessions scheduled at this time.

*Id.*

On February 12, 2018, Lowder completed another HCRF, this time asking for a refill of Pepcid. (Dkt. 42-1 at 22.) An unidentified health care staff member responded, "Too soon to fill issued 1/22." *Id.*

On February 23, 2018, Lowder completed another HCRF. *Id.* at 25. He said that Mobic was not helping and that he had been in excruciating pain since October 2017. *Id.* A nurse attempted to see Lowder about this HCRF on March 3, 2018, but he refused. *See id.* (noting "Refused"); *see also* Dkt. 35-4 at 12.

Dr. Talbot saw Lowder again on February 27, 2018. (Dkt. 35-2 ¶ 16; Dkt. 35-4 at 15.) The primary focus of this visit was Lowder's complaints of heartburn. *Id.* Lowder told Dr. Talbot that Pepcid was not working. *Id.* Dr. Talbot ordered that Lowder receive Carafate in addition to Pepcid and wrote six-month prescriptions for each. *Id.* He also ordered that Lowder's commissary logs be pulled to evaluate whether Lowder was buying foods that would aggravate heartburn. *Id.* The treatment note said, "Pull commissary and . . . if spicy food stop meds and he wou[]ld then have to purchase Zantac off commissary." (Dkt. 35-4 at 15.) Dr. Talbot discontinued Lowder's prescription for Pepcid in mid-March 2018, based on his review of Lowder's commissary records. (Dkt. 35-2 ¶ 17; Dkt. 42-2 at 26) (pharmacy records showing that Pepcid stopped on March 19,

2018).  Lowder was able to purchase heartburn medications from the commissary.  (Dkt. 35-2 ¶ 22; *see also* Dkt. 42-1 at 26) (commissary record showing Prilosec purchase).

Dr. Talbot's treatment note for the February 27, 2018 appointment shows that Lowder's prescription for Mobic was set to "stop" on March 2, 2018.  (Dkt. 35-4 at 17.)  Up through March 2, 2018, Lowder took every dose of Mobic that was prescribed to him.  (Dkt. 42-2 at 24, 29; Dkt. 35-3 at 80.)  Starting on March 3, 2018, the pharmacy stopped giving Lowder Mobic.  (*See* Dkt. 42-2 at 28.)

On March 16, 2018, Lowder again asked for a Pepcid refill by completing another HCRF.  (Dkt. 42-1 at 27.)  An unidentified medical care staff member responded, "Physician stopped all meds," and also wrote, "scheduled" in the response area of the form.  *Id.*

Dr. Talbot saw Lowder again on March 27, 2018.  (Dkt. 35-2 ¶ 17; Dkt. 35-4 at 6–8.)  Lowder asked for a refill of Pepcid.  *Id.*  Dr. Talbot entered a new order for Pepcid, apparently based on Lowder's representation that he had stopped buying spicy foods from the commissary.  *Id.*

Dr. Talbot next saw Lowder at a chronic care visit on April 24, 2018.  (Dkt. 35-2 ¶ 18; Dkt. 35-4 at 1–3.)  Lowder told Dr. Talbot that his heartburn was improving and that his symptoms were relieved by Pepcid.  *Id.*  They also discussed Lowder's hip issue.  *Id.*  Lowder told Dr. Talbot that Dr. Madsen said he needs a right hip replacement and complained that it had not been done.  *Id.*  Dr. Talbot observed that Lowder had normal function that day and was able to walk without a cane and up and down stairs.  *Id.*  He noted that Lowder's activities of daily living were normal.  *Id.*  He again reviewed Dr. Madsen's medical records, which stated that Lowder was too young for a hip replacement and recommended physical therapy (which Lowder had already received).  *Id.*  He also reviewed his prior notes showing his diagnosis of mild degenerative joint disc disease.

*Id.* In his summary judgment affidavit, Dr. Talbot stated that, at this visit, he offered Lowder pain medications, Lowder said he did not want them, and Dr. Talbot told him he could get pain medications from the commissary if he changed his mind. (Dkt. 35-2 ¶ 18.) At his deposition, Lowder testified that he never refused any medication, although he admitted telling Dr. Talbot that Mobic was not helping. (Dkt. 35-4 at 81–82.)[12] Lowder does not point the Court to any evidence refuting Dr. Talbot's claim that he told Lowder he could buy pain medications off the commissary. Dr. Talbot did not prescribe any medication for Lowder's back or hip conditions until sometime after Lowder filed this lawsuit, at which time he prescribed Cymbalta. (Dkt. 35-3 at 44.)

## C. Dr. Talbot's Examinations and Observations of Lowder

In October 2017, Lowder was placed in administrative segregation at Pendleton and remained there until at least February 2019. *See* Dkt. 35-3 at 11–12 (Lowder's February 13, 2019, deposition discussing his placement in administrative segregation housing); *see also* Dkt. 42-2 at 9, 11, 13, 15, 17, 19 –22 (restrictive status housing units/isolation rounds flow sheets and segregation/detention rounds flow sheets from October 2017 through May 2018). There is a separate health care unit available for assessing patients in segregation housing units; assessment in the separate health care unit still requires that a patient be brought from his cell to the examination room. (*See* Dkt. 43-1 ¶ 5.)

The majority of Dr. Talbot's interactions with Lowder occurred in these special health care unit rooms. *Id.* ¶ 6; *see also* Dkt. 35-3 at 78. Talbot was able to walk to the special heath care unit

---

[12]Lowder seeks to "impeach" Dr. Talbot, and accuses Dr. Talbot of perjury. (*See, e.g.*, Dkt. 42 at 11–12.) Impeachment is not necessary at the summary judgment stage because the Court must accept the facts in the light most favorable to Lowder. *See Skiba*, 884 F.3d at 717. Here, that means the Court accepts as true that Lowder never refused any medication and, by inference, that Dr. Talbot never offered to prescribe pain medication at the April 24, 2018, appointment. The Court does not make credibility determinations at the summary judgment stage. *See Miller*, 761 F.3d at 827. For purposes of summary judgment, any disagreement between Lowder's testimony and Dr. Talbot's testimony reveals, at most, a dispute of fact that might need to be decided by a jury, not an instance of perjury.

rooms to interact with Dr. Talbot, including, at times, walking up and down the stairs of the segregation building without a cane and with a normal gait. (Dkt. 43-1 ¶¶ 11–12.) When Dr. Talbot saw Lowder in the special health care unit rooms, there were no examination tables; instead, Lowder sat in a chair to talk to Dr. Talbot, and Dr. Talbot did not physically examine him. (Dkt. 35-3 at 78.)[13]

## D.    Dr. Talbot's Medical Opinions

In his summary judgment affidavit, Dr. Talbot explained that the evolving standard of care for GERD has moved away from chronic or long-term prescription of H2 blockers or proton pump inhibitors. (Dkt. 35-2 ¶ 23.) He explained that new medical research has made it apparent that long-term use of these medications, especially in lieu of lifestyle changes, can cause permanent esophageal scarring or other side effects. *Id.* Accordingly, he opined, it is always in the best interest of the patient to find ways to manage their heartburn in the absence of these medications, so as to limit the development of heartburn and avoid the potential side effects of long-term use of medications such as Pepcid or Carafate. *Id.*

Regarding Lowder's back and hip conditions, Dr. Talbot explained that he agreed with Dr. Madsen's decision that surgical intervention (be it hip replacement or lumbar surgery) is not prudent or indicated, especially given Lowder's ability to perform his activities of daily living. *Id.* ¶ 26. He explained that he would consider an outside referral if Lowder's condition changed such that he was unable to perform his activities of daily living or had a significant change in the location or intensity of his symptoms. *Id.* He stated that his goal had always been to provide Lowder with

---

[13] Dr. Talbot states he physically examined Lowder and that Lowder hopped on and off the examination table during his visits with Dr. Talbot. (*See* Dkt. 35-2 ¶ 25; Dkt. 43-1 ¶ 13.) In his response brief, Lowder asserts that he wants to "impeach" Dr. Talbot and accuses Dr. Talbot of perjury. (*See, e.g.*, Dkt. 42 at 11–12.) As noted, Impeachment is not necessary at summary judgment stage because the Court accepts Lowder's deposition testimony as true.

relief for his symptoms so that Lowder could perform activities of daily living. *Id.* As such, he did not believe Lowder needed any different or alternative treatment than that being provided at the time he signed his affidavit on March 7, 2019. *Id.* ¶ 27. At the time he signed the affidavit, he was not prescribing Lowder any medications for hip or back pain. (*See, e.g.*, Dkt. 35-3 at 44–45) (Lowder testifying on February 13, 2019, that Dr. Talbot prescribed Cymbalta for pain; Dr. Talbot discontinued Cymbalta because it caused Lowder to have an irregular heartbeat; and, after the discontinuation he had not received anything), *id* at 68 (Lowder saying that he was getting no medical treatment for pain).

E. **Treatment by Dr. Marthakis**

In approximately February 2019, Lowder was transferred from Pendleton to the Indiana State Prison ("ISP"). *See* Dkt. 32 (change of address form from February 2019); *see also* Dkt. 43-2 ¶ 4 (Dr. Marthakis' affidavit stating that Lowder's medical records show that he was transferred from Pendleton to ISP in February 2019). Nancy Marthakis, M.D., is a physician licensed to practice in the State of Indiana and employee of Wexford of Indiana. (Dkt. 43-2 ¶¶ 1–2.) She has seen and treated Lowder at ISP. *Id.* ¶ 3. When she examined Lowder on March 11, 2019, she performed a hip and leg examination. *Id.* ¶ 7. She noted he had a normal gait, lumbar spine, and range of motion. *Id.* She examined Lowder on the examination table, and he was able to get on and off the table with no difficulty. *Id.* ¶ 8. Lowder appeared entirely functional during her examination. *Id.* ¶ 9. Based on Dr. Marthakis' review of the medical records and her examination of Lowder, she did not believe Lowder required any off-site referral or significant intervention. *Id.* Given his complaints, however, she offered Lowder a prescription of Tylenol to be taken for discomfort. *Id.* Dr. Marthakis' professional opinion after examining Lowder is that he has the

ability to perform activities of daily living, ambulate to a health care unit, move around a correctional facility, and get on and off an examination table.  *Id.*¶ 10.

## F.  Complaints to Health Services Administrator Michelle LaFlower

Michelle LaFlower is a nurse licensed to practice in the State of Indiana.  (Dkt. 35-1 ¶ 1.) Since October 2017, she has been employed by Wexford of Indiana, LLC, as the Health Services Administrator at Pendleton.  *Id.* ¶ 2.  As the Health Services Administrator, she oversees the provision of health care Pendleton.  *Id.* ¶ 3.  Because she is not a physician, she does not have the authority to diagnose patients or order treatment.  *Id.*; *see also* Dkt. 35-3 at 22 (Lowder admitting that LaFlower could not order surgery for him or refer him to an outside specialist).  She performs many administrative tasks, such as supervision of nursing care, review of health care requests at times, responding to grievances, and addressing other needs that may come about in the health care unit.  (Dkt. 35-1 ¶ 3.)  LaFlower had no direct interactions with Lowder regarding his care and treatment.  *Id.* ¶ 8.

On October 31, 2017, Lowder completed a "Request for Interview" form.  (Dkt. 42-1 at 4.) He asked why Dr. Talbot had disregarded his medical condition "when [he] tried to explain that due to a 1983 suit, all conditions and filings are stayed on [his] medical issues until the Federal court rules on a motion."  *Id.*  He asked why Dr. Talbot refused to treat his condition.  *Id.*  At some point on or after November 22, 2017,[14] LaFlower responded.  *Id.*  She wrote, "10/31/17 offender discussed hip pain and acid reflux with Dr. Talbot.  Trial medication was ordered. 11/22/17 nurse visit referred to MD visit. Offender to be scheduled with MD."  *Id.*

---

[14]The response is undated but mentions events from November 22, 2017, (*see* Dkt. 42-1 at 4), so the Court concludes the response came on or after that date.

On January 11, 2018, Lowder completed another HCRF. (Dkt. 42-1 at 18.) He addressed it to LaFlower. *Id.* He wrote:

> I need to know why my treatment and prescribed medication orders by orthopedic specialist Dr. Kurt Madsen at Regional Hospital in Terre Haute are being disregarded. Dr. Talbot has stopped my prescribed meds for my serious medical condition and not following the ordered treatment plans that was ordered by the ortho specialist to treat my condition. I have been in excruciating pain for 60 days now.

*Id.*

The HCRF was forwarded to LaFlower for a response. (Dkt. 35-1 ¶ 4.) LaFlower reviewed Lowder's medical records, noting that Dr. Talbot had seen Lowder in October, November, and December 2017, as well as a number of chart updates about medications. *Id.* She also reviewed Lowder's medical records from WVCF and Dr. Madsen's records. *Id.* Because LaFlower could not order alternative treatment or change Lowder's medication, the goal of her review was to determine if Lowder lacked access to medical care or if there were "glaring omissions" in the treatment being provided. *Id.* ¶ 7. At the time of her review, Lowder had already seen Dr. Talbot several times, had x-rays of his back, had current prescriptions for Mobic and Pepcid, and had been referred for evaluation by a physical therapist. *Id.* ¶ 6. Based on her review, she believed Lowder was receiving medical care and was not aware of or concerned about any glaring deficiencies in Dr. Talbot's treatment. *Id.* In her summary judgment affidavit, she stated, "While physicians may disagree about specific medications or diagnosis, it did not appear that [Lowder] was being denied appropriate medical care." *Id.* ¶ 7.

After completing her review, LaFlower responded, "[r]eview of medical record indicates the orthopedic surgeon felt no surgical intervention was indicated after review of you[r] symptoms and see you and reviewing xrays. If there is additional information you care to provide, please do so." (Dkt. 42-1 at 18.)

On January 26, 2018, Lowder completed another "Request for Interview" form addressed to LaFlower. *Id.* at 21.[15] Again, he asked why his serious medical condition was being disregarded and why Dr. Madsen's treatment plans were being disregarded; he complained that he had been in excruciating pain since October 2017. *Id.* LaFlower responded, "[p]lease refer to grievance response date 2/5/18." *Id.* Neither party has provided the Court with a copy of a grievance response dated February 5, 2018.

In mid-February 2018 (less than a week after Lowder's request to refill his Pepcid prescription was denied as premature, *see* Dkt. 42-1 at 22), Lowder completed another "Request for Interview" form. *Id.* at 23. He wrote:

> I am requesting a [sic] answer as to why my medical condition is being disregarded and why I can not [sic] get a response from this office concerning my issues. I need a response as to why my prescribed medication was stopped and why I have not received any medical treatment that was ordered and prescribed by [specialist[16]].

*Id.* LaFlower responded, "[p]lease clarify which medication you are referring to and the medical condition you reference in order to better respond." *Id.*

---

[15]Lowder placed another "Request for Interview" form in the record. (Dkt. 42-1 at 20.) It is dated January 23, 2018. *Id.* In that form, Lowder complains that his medical condition is being disregarded, his medications have been stopped, and he has not seen a specialist. *Id.* He states that he is in excruciating pain. *Id.* The area for a response is blank. *Id.* In his unsworn response brief, Lowder asserts that he submitted this form on January 23, 2018, and never received a response. (*See* Dkt. 42 at 5.) Lowder's unsworn assertions cannot be considered at summary judgment, *see Collins*, 462 F.3d at 760 n.1, and there is no other evidence that this form was ever submitted (for example, the form is not Bates-stamped—which might suggest that Lowder received a copy from the Defendants—and there is no "Received" stamp on it), or that LaFlower failed to respond. Accordingly, the Court does not consider this form for purposes of summary judgment. Even if it did, however, credit Lowder's unsworn assertions, there would be no genuine issue of material fact because Lowder submitted a very similar "Request for Interview" form just a few days later (on January 26, 2018, *see* Dkt. 42-1 at 21), and LaFlower did respond to that form, (*see id.*). In light of the response to the January 26, 2018 form, Lowder fails to explain how the alleged failure to respond to the January 23, 2018 form caused him any harm.

[16]On the copy filed with the Court, the last word is partially cut off, reading only "spec." (*See* Dkt. 42-1 at 23.) Based on the context, the Court believes that it says "specialist."

On March 23, 2018 (approximately a week after Lowder asked for a refill of Pepcid and was told his GERD medication had been discontinued), Lowder completed another "Request for Interview" form. *Id.* at 28. He wrote:

> Why are you allowing Dr. Talbot to disregard my medical conditions by changing my medical diagnosis, stopping all my medications, and not following the ortho specialist treatment plans. I have been advising you of this issue for the last 6 months and nothing is being done. Why am I being subject [sic] to pain and suffering[?]

*Id.* LaFlower responded, "[y]ou have been seen multiple times for medical care. There are multiple instance [sic] documented for commissary abuse related to GERD symptoms. You were advised to obtain antiacid [sic] medication off commissary." *Id.*

### III.  DISCUSSION

Lowder asserts Eighth Amendment medical care claims against Dr. Talbot and LaFlower. At all times relevant to Lowder's claim, he was a convicted offender. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition

and the substantial risk of harm it posed but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison*, 746 F.3d 766, 775 (7th Cir. 2014). "To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc).

For purposes of summary judgment, the Defendants do not dispute that Lowder's GERD and hip and back conditions constitute objectively serious medical conditions under the Eighth Amendment. (*See generally* Dkt. 34.) They argue only that they did not display deliberate indifference to such conditions. *Id.*

"[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal quotation marks and quoted authority omitted). "If a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it." *Petties*, 836 F.3d at 729. But "in cases where unnecessary risk may be imperceptible to a lay person[,] a medical professional's treatment decision must be such a substantial departure from accepted medical judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.* (internal quotation marks and quoted authority omitted). In other words, "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir.

2014) (internal quotation marks and quoted authority omitted). "[E]vidence that some medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim." *Petties*, 836 F.3d at 729; *see also Pyles*, 771 F.3d at 409 ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.").

A.      **Dr. Talbot**

Lowder argues that Dr. Talbot was deliberately indifferent to his GERD and to his hip and back conditions. The Court discusses the conditions separately, below.

1.      **Hip and Back Conditions**

The undisputed facts show that Dr. Talbot reviewed Lowder's medical records, researched his conditions, and ordered new x-rays. (*See* Dkt. 35-2 ¶ 7–9; Dkt. 35-4 at 44.) His review of the medical records revealed that Dr. Madsen wanted to prolong hip surgery because of Lowder's age. (*Id.* ¶ 20; Dkt. 35-3 at 23, 30–32, 40.) And, even though Dr. Madsen has diagnosed Lowder with spondylolysis and spondylolisthesis, the new x-rays showed that Lowder did not have those conditions, but rather mild degenerative joint disease. (Dkt. 35-2 ¶ 9; Dkt. 42-2 at 16.) Dr. Talbot's research led to him to believe that Mobic was an appropriate medication for Lowder's conditions, and that Gabapentin was not indicated. (Dkt. 35-2 ¶¶ 9–10.) When Lowder complained that the initial dose of Mobic was ineffective, Dr. Talbot doubled the dose. (*Id.* ¶ 11.) And when Lowder continued to complain of pain, he prescribed Prednisone and ordered physical therapy. (*Id.* ¶ 12.) The physical therapist did not recommend any more sessions. (Dkt. 35-4 at 18–19.) Dr. Talbot did not see Lowder for hip and back pain again until about three months after the physical therapy appointment. (Dkt. 35-2 ¶ 18.) By that time, Lowder was no longer receiving Mobic, but Dr.

Talbot noted that Lowder had normal function, could walk without a cane, was able to use stairs with no difficulty, and could complete all his activities of daily living. *Id*. He told Lowder that he could obtain pain medications from the commissary. *Id.*

In sum, the record shows that Dr. Talbot exercised his medical judgment in making treatment decisions for Lowder's hip and back pain. There is no evidence that Dr. Talbot's treatment decisions were such that no minimally competent professional would have recommended the same under the circumstances, and there is no evidence that Dr. Talbot knew about a serious risk of harm to Lowder and disregarded it. *See Board*, 394 F.3d at 478; *Petties*, 836 F.3d at 729.

Lowder contends that Dr. Talbot was deliberately indifferent to his serious medical needs because Dr. Talbot disregarded Dr. Madsen's prescriptions and treatment plan. He takes particular issue with Dr. Talbot's affidavit statement that "there had been no specific recommendation from Dr. Madsen for [Lowder] to receive any back or hip surgery." (*See* Dkt. 42 at 10) (citing Dkt. 35-2 ¶ 8). Lowder argues there is a genuine issue of material fact because Dr. Madsen did, in fact, recommend surgery. To support this position, he relies on a June 8, 2017, "Consultation" note apparently written by a nurse working under Dr. Byrd at WVCF that says, "[p]er Dr. Madsen, this patient will [n]eed a [right] hip replacement. We can go right to scheduling or we can bring him back for [follow-up] to discuss the surgery and answer any questions." *See id.* (citing Dkt. 42-1 at 19).

"Failing to follow instructions received from outside experts can amount to deliberate indifference." *Harper v. Santos*, 847 F.3d 923, 927 (7th Cir. 2017). Given the second-hand nature of the reporting of Dr. Madsen's recommendation, it is questionable whether this note can serve as admissible evidence that Dr. Madsen ever said that Lowder could be scheduled for surgery. But

even if it could, it is undisputed that after the June 8, 2017 note, Dr. Madsen told Lowder that he wanted to prolong surgery because of Lowder's age. (Dkt. 35-3 at 23, 30–30, 40.) It is also undisputed that Dr. Madsen never actually ordered surgery for Lowder. *Id.* at 37; Dkt. 35-2 ¶ 8. Once the note is placed in context, no reasonable jury could rely on it to infer that Dr. Talbot failed to follow Dr. Madsen's most recent recommendations about Lowder's current need for surgery.

Lowder also argues that Dr. Talbot was deliberately indifferent because he discontinued Dr. Madsen's prescriptions for Gabapentin and Neurontin. Under the Eighth Amendment, Lowder is not entitled to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (11th Cir. 1997). And while failing to follow instructions received from outside experts can amount to deliberate indifference, *see Gil v. Reed*, 381 F.3d 649, 6652, 62–64 (7th Cir. 2017) (reversing grant of summary judgment to physician who ignored specialist's medication recommendation and instead prescribed a drug the specialist had specifically warned against), such is not always the case, *see Harper*, 847 F.3d at 926–27 (affirming grant of summary judgment to physician who discontinued pain medication prescribed by hospital physicians following surgery because the physician attempted to manage the prisoner's pain). Dr. Talbot did not simply disregard Dr. Madsen's previous course of treatment out of hand, and there were no warnings from Dr. Madsen that an alternate plan of treatment would be harmful. Instead, he considered Dr. Madsen's records and ordered new x-rays, which showed that Lowder did not have the condition with which Dr. Madsen had diagnosed him. (Dkt. 35-2 ¶¶ 4, 9; Dkt. 42-2 at 16.) He also performed his own research, which indicated that Gabapentin was not recommended for Lowder's condition and that Mobic was an acceptable substitute for Tramadol. (Dkt. 35-2 ¶¶ 9–10.)

On these facts, there is simply no evidence that Dr. Talbot knew that departing from Dr. Madsen's treatment plan would create a substantial risk of harm to Lowder. This is not a case

where the risk from Dr. Talbot's chosen course of treatment is obvious to a layperson; therefore, his treatment decisions are entitled to a wide degree of deference. *See Petties*, 836 F.3d at 729. Here, there is no evidence that Dr. Talbot's treatment decision was completely outside the bounds of accepted professional standards or such that no minimally competent professional would have made the same recommendation under the circumstances. The mere fact that Dr. Madsen or Dr. Byrd might have pursued a different course of treatment is insufficient to support a constitutional claim. In the legal standard section of his response, Lowder cites *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999), for the proposition that allegations that a physician failed to follow the advice of a specialist can support an Eighth Amendment claim. (*See* Dkt. 42 at 15–16.) To the extent that Lowder relies on *Jones*, that case is distinguishable because, among other things, the physician simply refused to follow instructions from a specialist without any explanation. *Jones*, 193 F.3d at 487, 490.

Lowder also complains that he was scheduled for a follow-up appointment with Dr. Madsen but did not see him again after being transferred to Pendleton. (Dkt. 42 at 28.) He cites no evidence to support his claim that he was scheduled to see Dr. Madsen again or that Dr. Madsen recorded that recommendation in a document.[17] At his deposition, he described his last appointment with Dr. Madsen in August 2017 and said that Dr. Madsen told him that he was rescheduling another visit in 30 days, (*see* Dkt. 35-3 at 31–32), but there is no evidence that Dr. Talbot knew about this recommendation. Regardless, in his summary judgment affidavit, Dr. Talbot stated that he believed referral to a specialist was unnecessary and that he would consider an outside referral if Lowder could no longer perform his activities of daily living or had a

---

[17]Lowder cites records from December 2016 and September 2017 to support his claim, *see* Dote. 42 at 28 (citing Exhibit A-11, which is in the record at DC. 42-1 at 29–32), but none of those records show that Dr. Madsen recommended that Lowder return to see him following their last meeting in August 2017.

significant change in the location or intensity of his symptoms. (Dkt. 35-2 ¶ 26.) There is no evidence that Dr. Talbot knew that failing to send Lowder to a specialist would cause Lowder substantial harm, and there is no evidence that his failure to send Lowder to a specialist fell far outside acceptable professional norms. *See Board*, 394 F.3d at 478; *Petties*, 836 F.3d at 729. Again, the mere fact that Dr. Madsen might have thought a follow-up appointment was necessary is not sufficient to state a constitutional claim. *See Petties*, 836 F.3d at 729.

Finally, Lowder contends that Dr. Talbot was deliberately indifferent because he "intentionally stopped all Plaintiff's treatment for his known medical condition for 7 months while knowing Plaintiff was suffering excruciating pain." (Dkt. 42 at 26.) This argument relates to when Lowder's prescription for Mobic expired in early March 2018 and Dr. Talbot did not renew it or prescribe alternative pain medication for several months; instead, Dr. Talbot told Lowder that he could buy pain medications off the commissary. (*See* Dkt. 35-2 ¶8; Dkt. 35-4 at 17; Dkt. 42-2 at 28.) The pharmacy records show that Lowder took Mobic on March 1 and 2, 2018. (Dkt. 42-2 at 28.)

In the space for March 3, 2018 someone wrote "STOP." *Id*. Lowder cites this as evidence that Dr. Talbot stopped his Mobic as of that date, (*see* Dkt. 42 at 25), and complains that Dr. Talbot "intentionally stopped all Plaintiff's treatment for his known medical condition for 7 months," *id.* at 26, at which point Dr. Talbot apparently provided some treatment, *see id.* (Lowder states that he received no treatment from March 3, 2018 until October 2018); (*see also* Dkt. 35-3 at 44–45) (Lowder's testimony that he received no treatment for six months, after which Dr. Talbot prescribed Cymbalta). Lowder cites no independent evidence supporting his unsworn and speculative suggestion that the stoppage of the medication represented an affirmative decision by Dr. Talbot not to give him Mobic after March 2, 2018. For example, he provides no evidence

showing that he requested a refill of the Mobic (although he filed some Health Care Request forms in which he requested refills of other medications, (*see, e.g.*, Dkt. 42-1 at 22 requesting refill of Pepcid)) and no evidence explaining whether prison doctors had automatically extended prescriptions beyond the "stop" date for him in the past. As such, the Court does not credit his claim that Dr. Talbot intentionally stopped the Mobic in March 2018 for purposes of summary judgment.

Lowder additionally fails to cite any evidence that Dr. Talbot knew that discontinuing the Mobic and leaving Lowder to purchase over-the-counter pain medications from the commissary would exacerbate Lowder's pain, and he fails to cite any evidence showing that Dr. Talbot's course of treatment was such that no minimally competent professional would have done the same in similar circumstances. *See Board*, 394 F.3d at 478; *see Petties*, 836 F.3d at 729. To the contrary, the record evidence shows that Lowder's current physician is treating him only with Tylenol. (*See* Dkt. 43-2 ¶ 9.)

Lowder cites caselaw holding that a prison physician cannot simply continue with a course of treatment that he knows is ineffective, (*see* Dkt. 42 at 16) (citing *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005)), but points the Court to no evidence that Dr. Talbot knew this course of treatment was ineffective and continued with it. Accordingly, Dr. Talbot's request for summary judgment as to Lowder's claims that he was deliberately indifferent to Lowder's hip and back conditions is **granted**.

### 2.   GERD

In the summary judgment brief, Dr. Talbot argues that he was not deliberately indifferent to Lowder's GERD. (Dkt. 33 at 22–23.) He relies on his affidavit, in which he explained his decision-making in the treating this condition, including his reliance on recent research showing

that it is in the best interest of patients to find ways to manage heartburn without medications like

Pepcid. (*See generally* Dkt. 35-2.)  In his response, Lowder mentions Dr. Talbot's treatment of

his GERD only briefly, stating,

> Plaintiff received no treatment [for his hip and back conditions] from March 3, 2018 until October 2018, after Plaintiff filed this complaint. Dr. Talbot must of wanted to make a showing of some type of treatment he provided for Plaintiff's medical condition.

> Talbot even showed a good effort and ordered Plaintiff's Pepcid heartburn medication that does not work for Plaintiff's Gerd condition, for 1 year.

Dkt. 42 at 26.  To the extent this constitutes an argument that Dr. Talbot was deliberately

indifferent to Lowder's GERD and heartburn, it fails.  Lowder cites no evidence in support of his

claim that Pepcid did not work.  And, even if he did, he cites no evidence that Dr. Talbot knew

that prescribing Pepcid would cause Lowder substantial harm and no evidence that Dr. Talbot's

course of treatment represented a substantial departure from accepted medical norms. *See Board*,

394 F.3d at 478; *Petties*, 836 F.3d at 729.  Dr. Talbot's Motion for Summary Judgment on

Lowder's claims that he was deliberately indifferent to Lowder's GERD and heartburn is also

**granted**.[18]

## B.    <u>Health Services Administrator LaFlower</u>

Lowder contends that LaFlower's responses to his complaints show that she was

deliberately indifferent to his serious medical needs.

The undisputed evidence shows that LaFlower's involvement in Lowder's medical care

was limited to responding to several of his complaints about Dr. Talbot's treatment.  As such,

---

[18]To the extent that Lowder's statement that he "received no treatment from March 3, 2018 until October 2018" can be read to encompass his GERD, the undisputed facts refute his claim. The record shows that he was without medication for GERD for less than 10 days (from the time Dr. Talbot discontinued his medications based on review of his commissary records until he reinstated the Pepcid prescription on March 27, 2018).  (See Dkt. 42-2 at 26; Dkt. 35-2 ¶ 17.)  Lowder does not argue that the brief discontinuation of Pepcid based on his commissary abuse amounts to deliberate indifference.

Lowder's complaints about LaFlower are essentially derivative of his complaints about Dr. Talbot. Because Lowder's deliberate indifference claims against Dr. Talbot fail, his claims against LaFlower must fail, too. That is, if Dr. Talbot did not provide constitutionally inadequate care, then LaFlower cannot be liable for deliberate indifference either. *See Jones v. Drew*, 221 F. App'x 450, 455 (7th Cir. 2007) ("Because [the prisoner] received constitutionally adequate care for his bunions, the court also properly entered summary judgment for . . . the Health Care Unit Administrator at [the prison] and . . . the medical director of the [department of corrections]."); *see also Dobbey v. Randle*, No. 10-cv-3965, 2015 WL 5245003, at *10 (N.D. Ill. Aug. 26, 2015) (concluding that, in the absence of evidence of deliberate indifference on the part of the treating physician and physician's assistant, there was no obligation for the administrators reviewing his grievances to assist beyond the care already being provided to him).

Even if this were not so, though, Lowder's claim against LaFlower would fail. Again, LaFlower's involvement with Lowder's care was limited to responding to his complaints in her role as Health Services Administrator. Lowder does not claim that LaFlower treated him. In such a situation, an administrator is generally "entitled to rely on the judgment of medical professionals treating an inmate," and the Seventh Circuit has found that summary judgment should be granted in the absence of evidence that the administrator had reason to doubt that the treating professionals based their recommendations on anything other than medical judgment or that the administrator should have realized that something was amiss with the treating professional's actions. *See Rasho v. Elyea*, 856 F.3d 469, 479 (7th Cir. 2017); *see also Jones*, 221 F. App'x at 452, 455 (affirming grant of summary judgment to nurse who was the health care unit administrator at the prison and physician who was medical director of the department of corrections and reasoning, "Even if, as [the prisoner] contends, [the defendants] knew about [his] complaints about his bunions, there is

no evidence that they regarded the medical care [he] was receiving to be devoid of professional judgment, as is required to establish a constitutional violation.").[19]

At his deposition, when asked why he was suing LaFlower, Lowder identified only one instance of alleged deliberate indifference—her response to his January 11, 2018, HCRF. (*See* Dkt. 35-3 at 20–23.) There is no evidence that LaFlower's response represented deliberate indifference. Instead, the undisputed evidence shows that she reviewed Lowder's medical records (including Dr. Madsen's records), saw that Dr. Talbot had been assessing and treating Lowder, believed that Lowder was receiving medical care, and was not aware of any glaring deficiencies in his treatment of Lowder. (*See generally* Dkt. 35-1.)

Lowder contends there is a genuine issue of material fact as to whether LaFlower "changed" his "diagnosis" by writing that the "orthopedic surgeon felt no surgical intervention was indicated," when previously Dr. Madsen had said that he would need a hip replacement. (Dkt. 42 at 21–22.) But no reasonable jury could conclude that LaFlower's response represented a "diagnosis" of Lowder's condition; the face of the document makes plain that she was merely summarizing the medical records. (Dkt. 42-1 at 18.) And, regardless, no reasonable jury could find that there was a "change". As explained, the undisputed evidence shows that Dr. Madsen never ordered surgery for Lowder and that he was prolonging surgery for as long as possible because of Lowder's age. (Dkt. 35-3 at 23, 3—32, 37–38, 40.) To the extent Lowder complains that LaFlower did not explicitly state that Dr. Madsen did not think that any surgical intervention

---

[19]The Court recognizes that LaFlower is a nurse. However, in this case, Lowder is not seeking to hold her responsible as a treating professional, but rather as an administrator. In such a situation, a prison official is entitled to rely on the judgment of the medical professionals treating the inmate, even if the official herself has medical training. *See Rasho*, 856 F.3d at 478–79 ("While [the defendant doctors] were themselves medical professionals who might be ordinarily be held to a different standard than a non-medical prison official, in this case [the prisoner] seeks to hold [the doctors accountable as prison administrators and policymakers, not treaters.").

was indicated *at the time*, he fails to explain how that omission harmed him or amounted to deliberate indifference.

Lowder also argues that there is a genuine issue of material fact because LaFlower stated in her summary judgment affidavit that "her only involvement was responding to a Health Care Request, and she had no other direct or indirect involvement in Plaintiff's medical care," but, in reality, she responded to several other complaints, which the Court has included in the Background section. (*See* Dkt. 42 at 17–21.) He contends that those responses represent "direct involvement" with his health care. *Id.* But LaFlower did not state that her *only* involvement with Lowder was responding to the January 11, 2018 HCRF, and she did not state that she had no other "direct or indirect involvement" in Lowder's care. Instead, she discussed her response to the January 11, 2018 HCRF and stated that she had no direct *interactions* with Lowder regarding his health care and treatment, a statement that stands undisputed. (*See* Dkt. 35-1 ¶¶ 4–8.)

Regardless, even if a reasonable jury could conclude that LaFlower's responses to Lowder's complaints constituted "direct interactions" with him, the dispute is not material because Lowder comes forward with no evidence suggesting that LaFlower participated in his treatment. Likewise, as to her role as an administrator, Lowder cites no evidence that could support a claim of deliberate indifference, such as evidence that LaFlower was simply ignoring him, had reason to believe that Dr. Talbot's medical treatment was not based on his medical judgment, or should have realized that something was amiss with Dr. Talbot's actions. *See Rasho*, 856 F.3d at 479. Instead, the record shows that, for the most part, LaFlower responded to Lowder's requests for explanations of Dr. Talbot's actions with summaries of Lowder's medical treatment. (*See* Dkt. 42-1 at 4, 18, 28.)

Lowder contends that LaFlower "failed to address" the issue raised by his January 26, 2018, grievance. (Dkt. 42 at 5.) But the record shows that she did respond and referred Lowder to her February 5, 2018 grievance response. (Dkt. 42-1 at 21.) Lowder did not file a copy of the February 5, 2018 grievance response or summarize it, and he did not offer any admissible evidence that such response did not exist. At best, then, the response to the January 26, 2018 grievance creates a "metaphysical doubt" as to the adequacy of LaFlower's response, which is insufficient to avoid summary judgment. *See Matsushita*, 475 U.S. at 586.

Lowder also points to LaFlower's response to his February 18, 2018 complaint—in which she asked him to clarify what medical condition he was addressing—as "clear and convincing evidence" that she was deliberately disregarding his medical condition. (Dkt. 42 at 5–6, 20) (citing Dkt. 42-1 at 23). But the face of the February 18, 2018 complaint includes no reference to any specific condition, (*see* Dkt. 42-1 at 23), and there is no evidence from which a reasonable jury could infer that LaFlower was anything other than sincere in her request for more information as to which medical condition Lowder was addressing.

In addition, Lowder puts forth LaFlower's response to the March 23, 2018 complaint as evidence of deliberate indifference because she "fail[ed] to address the issue of my medical condition and diagnoses being changed from needing a hip replacement to mild" and because her acknowledgement that he had been seen by a doctor multiple times shows "she was aware [his] condition was being disregarded." (Dkt. 42 at 6–7, 20.) As explained, however, no reasonable jury could conclude that Dr. Talbot's and LaFlower's statements about Lowder not currently needing surgery amount to a "change" of "diagnosis." And mere knowledge that Lowder had been seen multiple times for his health conditions does not equate to knowledge of constitutionally inadequate care.

Finally, in his "Statement of Material Facts in Dispute," Lowder mentions that he has submitted many HCRFs regarding his serious medical conditions in the section discussing his claims against LaFlower. (Dkt. 42 at 4.) To the extent they are relevant, the Court has summarized those HCRFs in the Background section and accepted Lowder's account of them as true. The Court has addressed the January 11, 2018 HCRF, and LaFlower's response to it, above. To the extent that Lowder relies on the other HCRFs to support his deliberate indifference claim against LaFlower, that reliance fails because there is no evidence that LaFlower knew about or participated in responding to those HCRFs. Lowder also fails to explain the responses to those HCRFs were inadequate. Accordingly, LaFlower's Motion for Summary Judgment is **granted**.

## IV.    CONCLUSION

For the reasons stated above, the Defendants' Motion for Summary Judgment, Dkt. [33], is **GRANTED**. This action is **DISMISSED with prejudice**. Final judgment consistent with this Order shall now issue.

**SO ORDERED.**

Date: 2/19/2020

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Curt Lowder, #972067
Indiana State Prison
Inmate Mail/Parcels
One Park Row
Michigan City, Indiana  46360
Electronic Service Participant
(Court Only)


Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com